# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

JOHN AUBREY LAYER,

    *Petitioner*,

vs.

JACK PALMER, *et al.*,

    *Respondents*.

3:11-cv-00500-RCJ-WGC

ORDER

This habeas matter under 28 U.S.C. § 2254 comes before the Court on a *sua sponte* inquiry as to whether the petition is time-barred because it was not filed within the one-year limitation period in 28 U.S.C. § 2244(d)(1). This order follows upon an earlier show-cause order (#8), a filing (## 12 & 13) by respondents with state court record materials, and petitioner's subsequent filing (#15) within the time allowed for a response.

### *Background*

The following procedural history is not disputed.

Petitioner John Aubrey Layer challenges his Nevada state conviction, pursuant to an *Alford* plea, of two counts of attempted lewdness with a child under the age of fourteen.

At the time of his plea, Layer was charged with 14 counts of sexual assault of a minor under fourteen years of age, 9 counts of lewdness with a child under fourteen, 2 counts of indecent exposure, and 2 counts of open or gross lewdness, allegedly occurring collectively between May 14, 1998, and January 31, 2006. The State alleged that Layer committed offenses against his two step-granddaughters, C.P. and M.P.

On January 7, 2009, Layer entered a plea to two counts of attempted lewdness with a child under 14 between May 14, 1998, and January 31, 2006. Layer pled under *Alford* to "attempting to touch and/or rub and/or fondle the breast(s) and/or the genital area of . . . [C.P.] with his hand(s) and/or finger(s)" and to performing the same acts on M.P. with his hand(s).

Following sentencing, the judgment of conviction was filed on April 14, 2009.

Petitioner did not file a direct appeal. The time for doing so expired on May 14, 2009.

More than a year later, on July 22, 2010, petitioner filed a state post-conviction petition. The state district court denied the petition as untimely, and the Supreme Court of Nevada affirmed on the same basis. The remittitur issued on March 7, 2011.

On or about July 13, 2011, petitioner mailed the federal petition for filing.

## *Discussion*

Pursuant to *Herbst v. Cook*, 260 F.3d 1039 (9th Cir. 2001), the Court *sua sponte* has raised the question of whether the petition is time-barred for failure to file the petition within the one-year limitation period in 28 U.S.C. § 2244(d)(1).

### *Base Calculation of the Limitation Period*

Under 28 U.S.C. § 2244(d)(1)(A), the federal one-year limitation period, unless otherwise tolled or subject to delayed accrual, begins running after "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such direct review." Under 28 U.S.C. § 2244(d)(2), the federal one-year limitation period is statutorily tolled during the pendency of a properly filed application for state post-conviction relief or for other state collateral review. However, an untimely state petition is not "properly filed" and thus does not statutorily toll the federal limitation period. *Pace v. DiGuglielmo,* 544 U.S. 408, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005).

In this case, the time for seeking direct review expired on May 14, 2009. The one-year limitation period therefore putatively expired one year later on May 14, 2010.

Petitioner's July 22, 2010, state petition was filed after the federal limitation period already had expired. The untimely state petition in any event would not statutorily toll the federal limitation period. *Pace, supra.*

1  The federal petition was not constructively filed until on or about July 13, 2011, more
2 than a year after the federal limitation period had expired, absent delayed accrual or tolling.
3  The federal petition thus is untimely on its face.

***Equitable Tolling***

The show-cause order clearly stated petitioner's burden with regard to equitable tolling:

> In this regard, petitioner is informed that the one-year limitation period may be equitably tolled. Equitable tolling is appropriate only if the petitioner can show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, ___ U.S.___, ___, 130 S.Ct. 2549, 1085, 177 L.Ed.2d 130 (2009)(*quoting prior authority*). Equitable tolling is "unavailable in most cases," *Miles v. Prunty*, 187 F.3d 1104, 1107 (9th Cir.1999), and "the threshold necessary to trigger equitable tolling is very high, lest the exceptions swallow the rule," *Miranda v. Castro*, 292 F.3d 1063, 1066 (9th Cir.2002)(*quoting United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir.2000)). The petitioner ultimately has the burden of proof on this "extraordinary exclusion." 292 F.3d at 1065. He accordingly must demonstrate a causal relationship between the extraordinary circumstance and the lateness of his filing. *E.g., Spitsyn v. Moore*, 345 F.3d 796, 799 (9th Cir. 2003). *Accord Bryant v. Arizona Attorney General*, 499 F.3d 1056, 1061 (9th Cir. 2007).

#8, at 3-4.

The filing presented by petitioner within the extended show-cause response period establishes no basis for equitable tolling of the federal limitation period. Petitioner titled the filing as a "Motion of Evidence in Support of Habeas Corpus Pursuant to 28 U.S.C. § 2254." He sought therein "to show cause as to why the petitioner's habeas petition should not be dismissed." Petitioner did not present any factual or legal argument therein establishing a viable basis for equitable tolling of the federal limitation period. He instead sought principally to establish that he was entitled to relief on the merits because of alleged ineffective assistance of counsel in connection with his plea. Such a response begs the question when the threshold issue instead is timeliness.

The Court accordingly finds that petitioner failed to carry his burden of establishing a viable basis for equitable tolling. Petitioner was informed of the governing standards and given an opportunity to respond. His response presented no basis for equitable tolling.

-3-

*Delayed Accrual*

The show-cause order further informed petitioner of the statutory provisions in 28 U.S.C. § 2244(d)(1)(B), (C) & (D) allowing for possible delayed accrual of the limitation period. See #8, at 4. Petitioner's merits-focused response similarly did not present any basis for any such delayed accrual. The Court accordingly finds that petitioner failed to carry his burden of establishing a viable basis for delayed accrual.

*Actual Innocence*

A petitioner may avoid application of the time-bar based upon a showing of actual innocence as an equitable exception to the limitation period. *See McQuiggin v. Perkins*, 133 S.Ct. 1924 (2013).

The show-cause order stated petitioner's burden on such a claim of actual innocence:

> . . . . [T]he petitioner must come forward with new reliable evidence that was not presented previously that, together with the evidence adduced previously, demonstrates that it is more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. *See,e.g., Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *see also Griffin v. Johnson*, 350 F.3d 956, 961-63 (9th Cir. 2003), *cert. denied*, 124 S.Ct. 2039 (2004). In this regard, "actual innocence" means actual factual innocence, not mere legal insufficiency. *See,e.g., Sawyer v. Whitley*, 505 U.S. 333, 339, 112 S.Ct. 2514, 2518-19, 120 L.Ed.2d 269 (1992). The court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial," and "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Schlup*, 513 U.S. at 332, 115 S.Ct. at 869.
>
> Moreover, in the context of a conviction entered on a plea, the petitioner must come forward with such evidence not only as to the charges as to which he entered a plea, but, in addition, *as to all other charges pending against him in the case prior to the plea, including charges dismissed pursuant to the plea deal.* See *Bousley v. United States*, 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).

#8, at 5 (emphasis in original).

Petitioner's response does address actual innocence, as he claims that counsel was ineffective in failing to develop alleged evidence of his actual innocence prior to his plea. His response fails to satisfy the narrow *Schlup* actual innocence gateway, however.

-4-

The evidence that the State would have presented against Layer on the twenty-seven counts if he had not entered an *Alford* plea to two lesser charges in part was reflected by the testimony of C.P. and M.P. at the preliminary hearing. At the time of the May 31, 2006, preliminary hearing, C.P. had just turned fourteen years old, and M.P. was twelve years old.

C.P. testified to multiple different incidents, with the first occurring when she was six (in or around 1998) and the last when she was ten (in or around 2002). According to C.P.'s testimony, the incidents occurred in a bedroom at the Layers' then-current residence while her grandmother was away at work, with her younger sister present.[1]

During the first incident, C.P. testified that Layer touched her breast and "private part," or vagina, with his hands over and under her clothes and with her nude after he disrobed her.[2]

During a second incident, C.P. testified that Layer came into the bedroom after she got out of the shower and had only a T-shirt on and that he inserted his finger into her vagina and tried to kiss her on her lips.[3]

During a third incident, when she was eight, C.P. testified that Layer told her and her sister to touch his "private part," or penis, and move her hand up and down. She testified that she did so until "white stuff came out."[4]

During a fourth incident, C.P. testified that Layer got into the shower with her naked when she was nine-and-a-half or ten; touched her breasts, "butt," and vagina with his hands; and then inserted a finger in her vagina.[5]

////

---

[1] E.g., #12, Ex. 1, at 14, 21 & 41-52. The Court makes no findings of fact or credibility determinations in summarizing testimony or other evidence presented by or available to the State. The Court summarizes the evidence only to reflect the evidence that was available to the State to present to a jury at trial. No factual statement made in describing evidence constitutes a factual finding by this Court. The Court outlines the evidence regarding, *e.g.*, penetration with specificity as backdrop to the discussion of petitioner's arguments.

[2] #12, Ex. 1, at 13-20.

[3] #12, Ex. 1, at 21-23.

[4] #12, Ex. 1, at 35-37.

[5] #12, Ex. 1, at 22-26.

During the final incident, when she was ten, C.P. testified that Layer got into the shower with her "again the same exact way." According to her testimony, afterwards, after she got out of the shower and with her sister present, Layer went into his closet and took out a pump, put his penis in the pump, and told her to pump it. His penis then got bigger. Layer showed them multiple objects in a box that he said that he got from an adult store, including dildos and bottles of lubricant. Layer put lubricant on his finger and inserted his finger into her vagina. He then put a dildo in her vagina. Five or ten minutes later, he put or "tried to put" his penis in her vagina. That was the only time that he penetrated her vagina with his penis. C.P. testified that "he didn't do it like all the way, it was just halfway" and "for a few seconds." She testified that she did not know whether his penis was hard or soft and that "he took it out and white stuff just started coming out."[6]

M.P. also testified to multiple incidents, which started when she was six or seven. Her sister was not present in the immediate vicinity during all of the incidents.[7]

During the first incident, M.P. testified that Layer touched her breasts and vagina over and under her clothes, disrobed her, continued touching her and inserted his finger in her vagina, told her to touch his penis, placed her hands on his penis when she refused, and then had her masturbate him until he ejaculated.[8]

During the second incident, when she was seven or eight, M.P. testified that Layer again touched her vagina, disrobed her, inserted his finger in her vagina, and took off his pants leaving his underwear on.[9]

In another incident, when she was eleven, M.P. testified that Layer took her clothes off and then tried to put adult toys in her vagina. The first one that he tried was too big. He then

---

[6] #12, Ex. 1, at 26-35 & 57-59. C.P. did not use terms such as "dildo" at the preliminary hearing but instead described the adult objects.

[7] #12, Ex. 1, at 101-06 & 121.

[8] #12, Ex. 1, at 65-72. M.P. did not use terms such as "masturbate" and "ejaculate" in her testimony.

[9] #12, Ex. 1, at 72-74.

1  inserted another one that went in "like halfway" or "[l]ike mostly all the way" but she told him
2  to stop because it started hurting. He then inserted his penis in her vagina. After his penis
3  went halfway, she told him to stop because it hurt. She testified that the penetration lasted
4  for only "a few seconds" because "like he tried to put it in but then it went in only halfway and
5  I told him to take it out." She did not know whether his penis was hard or soft.[10]

6  In another incident, when she was twelve, M.P. testified that Layer disrobed her and
7  put his penis in her vagina a second time. She did not testify as to the amount of penetration,
8  but she testified that "it felt weird and then it started hurting."[11]

9  In another incident, M.P. testified that Layer touched her vagina with his hand while
10 they were in the car stopped at a light on the way to see her other grandmother. She testified
11 that Layer reached under her skirt, felt her vagina through her panties, and then reached
12 under her panties and inserted his finger in her vagina.[12]

13 In two other incidents, M.P. testified that Layer used a penis pump, once with only M.P.
14 present and another time with both sisters present. In the incident where only M.P. was
15 present, he had her pump the object with his penis in it until he ejaculated.[13]

16 M.P. testified that Layer would make her shower with him on multiple occasions with
17 both naked in the shower. He either would tell her to get in the shower with him or get into
18 the shower with her when she already was in the shower. She testified that if she tried to get
19 out of the shower, he would pull her back in by the arm. He would touch her breasts and
20 vagina with his hands, inserting his finger in her vagina. She testified that this happened
21 "[m]ostly everytime I took a shower over there."[14]

22  / / / /

23  ---

24  [10] #12, Ex. 1, at 74-81 & 121-22.

25  [11] #12, Ex. 1, at 81-83.

26  [12] #12, Ex. 1, at 95-96.

27  [13] #12, Ex. 1, at 89-92.

28  [14] #12, Ex. 1, at 84-86.

1    M.P. testified that, beginning when she was eleven, Layer would lick her breasts and/or
2 her vagina, often when she already was naked about to get into or out of the shower.  She
3 testified that this "happened like everytime."[15]
4    M.P. further testified that she often would see Layer walking around the residence
5 without any clothes on, generally before or after his being in the shower.[16]
6    M.P. testified to one additional specific incident in which Layer put his hand under her
7 vagina while she was sitting on the toilet urinating, licking his hand afterwards.[17]
8    In his filing, petitioner maintains:

> . . . these allegations, and charges were made against petitioner . . . a man incapable of obtaining an erection, counsel . . . was given a copy of a medical report from Dr. Kaplan showing his problems being so severe that Viagra was limited in its success back in early 1999.

12 #15, at electronic docketing page 9.

13    Petitioner's alleged impotence – discussed further *infra* – would not have established
14 actual innocence under the *Schlup* standard as to the two lesser counts of attempted
15 lewdness with a child under fourteen to which he pled under *Alford*.  In entering a plea under
16 *Alford*, he conceded that the State could show, *inter alia*, that he attempted to fondle the
17 breasts and/or genital areas of the children with his hands and/or fingers.  Layer did not have
18 to be able to maintain an erection to attempt to fondle the children with his hands or fingers.

19    Nor did petitioner have to be able to maintain an erection to commit the nine greater
20 counts of lewdness with a child under fourteen based upon his fondling the breasts, vagina,
21 and/or buttocks of the children with his hands and/or fingers; and/or having the children fondle
22 his penis with their hands; and/or placing his mouth and tongue on the breasts of one of the
23 children; and/or showering naked with a child; and/or having a child urinate on his hand, as
24 charged in Counts 6 through 8 and 18 through 23 of the information.

---

[15] #12, Ex. 1, at 86-89.

[16] #12, Ex. 1, at 83-84.

[17] #12, Ex. 1, at 92-93.

-8-

Nor did petitioner have to be able to maintain an erection to commit the two counts of indecent exposure based upon his taking a shower and/or being naked in the presence of a child, as charged in Counts 24 and 25 of the information.

Nor did petitioner have to be able necessarily to maintain an erection to commit the two counts of open or gross lewdness based upon his enlarging his penis with a penis pump in the presence of a child, as charged in Counts 26 and 27 of the information.

Nor did petitioner have to be able to maintain an erection to commit the eleven counts of sexual assault of a minor under fourteen based upon his inserting his fingers and/or a dildo and/or his mouth and/or tongue in a child's vagina, as charged in Counts 1 through 3, 5, 9 through 12, and 15 through 17 of the information.

Petitioner's, alleged, impotence would not demonstrate that it is more likely than not that no reasonable juror would have found Layer guilty beyond a reasonable doubt of the nine counts of lewdness with a child under fourteen, two counts of indecent exposure, two counts of open or gross lewdness, and eleven counts of sexual assault of a child under fourteen based upon other than penile penetration, much less the two counts of attempted lewdness with a child under fourteen to which he admitted guilt.

However, petitioner maintains that an inability to commit the three counts of sexual assault of a child under fourteen based upon penile penetration of a child's vagina – as charged in Counts 4, 13, and 14 of the information – establishes that the children were lying on all twenty-seven counts. That is, he maintains that his alleged impotence puts the lie to all of their testimony, directly as to the three counts based upon alleged penile penetration as well as indirectly, by undercutting their credibility, as to the twenty-four counts not based upon alleged penile penetration.

The purported medical evidence[18] that petitioner presents, however, in fact does not establish that he was incapable of attaining and maintaining an erection at the relevant time.

---

[18] The entirely typewritten paper with no signature that petitioner presents, discussed *infra*, is neither authenticated nor self-authenticating. The purported evidence in all events on its face does not support petitioner's factual claim that he was incapable of the offenses due to alleged impotence.

The paper presented by petitioner states in full:

> PATIENT: LAYER, JOHN
> DATE: March 24, 1999
>
> HISTORY: This patient returns to the clinic with a history of impotency. He has used Viagra at a dose of 100 mg, however, he has an atypical reaction in that he does not get a full erection for eight hours until after he takes the Viagra. He feels that his recent exacerbation of impotency is a consequence of his worsening diabetes.
>
> RECOMMENDATIONS: We discussed options at this time to include vacuum erection devices, vasoactive injection therapy or continued use of the Viagra. I did give the patient a prescription for Viagra. I gave him a video tape on the injections and the patient will meet with the Osbon vacuum erection device representative. This seems to be his favorite option at the present time. We also discussed some of the risks and benefits associated with penile prosthesis. The patient is probably not a very good candidate for an implant at this time but he may be in the future.
>
> Michael S. Kaplan, M.D.
> MSK:slk

#15-2, at electronic docketing page 33 of 68.

This document does not establish that petitioner was incapable of the offenses testified to by the children, including the three offenses involving penile penetration.

The document does not reflect that petitioner was wholly unresponsive to medication at the time of the March 1999 report. The document instead suggests that he would not attain an at least full erection until eight hours after taking Viagra. That would mean that he could attain a full erection after taking Viagra, only atypically eight hours after taking the medication. To state the point directly, an erection attained at an atypical time still is an erection.

Nor does the document reflect that petitioner had full and complete impotence at the time of the March 1999 report without any prospect of medical improvement. The physician and patient instead were discussing available treatment options. Those options included, *inter alia*, injections and a vacuum erection device that the physician identifies as the patient's "favorite option at the present time." If petitioner had been fully and completely impotent at that time with no possibility of medical improvement thereafter, there would have been no occasion for discussion of treatment options, much less a favorite option.

The reference to a vacuum erection device in the document is not necessarily inconsistent with the penile pump that the children testified that petitioner used on a number of occasions in their presence. The children's testimony – pertaining to a time later than March 1999 – would tend to suggest that his "favorite option" – perhaps also in conjunction with another therapy or therapies – proved to be an effective option at the relevant times. In this regard, the March 1999 report tends to corroborate rather than undercut their testimony.

Moreover, the March 1999 dated document does not speak to Layer's condition, and the efficacy of subsequent treatment options, at the times relevant to Counts 4, 13 and 14 based upon penile penetration. As outlined previously, C.P. testified that Layer inserted his penis in her vagina on one occasion when she was ten, which would have been in or around 2002. M.P. testified that Layer inserted his penis in her vagina on two occasions, with the first occurring when she was eleven, which would have been in or around 2005. A March 1999 report obviously cannot speak to petitioner's condition years later in 2002 and 2005, or to the ultimate efficacy of the treatment options that physician and patient then were discussing.

Further, the two young girls were unable to testify as to the extent of petitioner's erection, *i.e.,* as to whether his penis was hard or soft when he penetrated them. Petitioner would not necessarily have been unable to commit the offenses as testified to by the children with less than a full erection.[19]

In short, the paper presented by petitioner belies rather than supports the claim that medical evidence established that he was incapable of committing the offenses involving penile penetration. The purported medical evidence presented by petitioner, on its face, would not establish in conjunction with the trial evidence that is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt of the three counts involving penile penetration, much less the remaining twenty-four counts.[20]

---

[19] Nor does the March 1999 report reflect that Layer was incapable of attaining a sufficient erection through to ejaculation when he had a child masturbate him by hand, with regard to such a lewdness count.

[20] Petitioner further relies on a May 26, 2010, affidavit by his wife attesting, *inter alia*, that "I have to
(continued...)

-11-

Petitioner further contends that normal examination findings from February 2006 sexual assault examinations of the children establish that they were lying. Petitioner maintains in particular that: (a) the police arrest reports and voluntary statements of the children reflect that C.P. stated that Layer "placed his penis inside her vagina . . . once a week from the time she was six until she was ten years old;"(b) "with simple math, there [are] 52 weeks in a year, so, 52 x 4 (4 years) equals 208 times of having sexual intercourse with ane [sic] adult male, plus being assault[ed] with a large 'dildo;'" (c) such repeated sexual intercourse with an adult male as well as the use of the dildo "would have destroyed [the victim's] hymen;" (d) the normal examination findings "absolutely precludes sexual intercourse

---

[20](...continued)
wonder why a doctor statement that John was incapable of having intercourse was never brought into evidence." #15-1, at electronic docketing page 44 of 68.  The affidavit of the wife, who was not a disinterested witness, of course cannot establish what the medical evidence did nor did not establish.  Nor could she have presented admissible and competent testimony at a trial as to what the medical evidence allegedly showed.  The March 1999 paper tendered herein would not establish that Layer was incapable of having intercourse in 1999 or at the relevant times in or around 2002 and 2005.  The wife's affidavit clearly does not satisfy the narrow *Schlup* actual innocence gateway, either alone or in combination with competent evidence.

Petitioner's wife's affidavit is dated around the time of an April 13, 2010, complaint that petitioner made  to the state bar association regarding defense counsel. See #15, at electronic docketing pages 121-22.  The papers presented reflect that petitioner alleged that counsel "had in her possession medical records showing that I have been impotent since [sic] 1994, and that there is no sex drive whatsoever." *Id.*, at 122.  The papers reflect that counsel responded to this allegation as follows:

> . . . Mr. Layer refers to records I had showing he was impotent.  This is true: I had such records.  However, due to specific facts of the case, I explained to Mr. Layer that this was not necessarily a good defense.  I can elaborate if necessary but do not wish to do so at this time unless directed to be more specific and waive any privileges.

#15, at electronic docketing page 125.  There is no occasion to delve further into counsel's reasons why the level of impotency reflected by the tendered medical evidence was not a good defense.  On the face of the purported medical evidence presented with the show-cause response, the evidence would not satisfy the narrow *Schlup* actual innocence gateway, as the March 1999 report does not establish that petitioner was incapable of the penile penetration offenses either in March 1999, or more to the point, at the relevant times.  Petitioner's claim of actual innocence due to impotence simply is not factually supported by the evidence that he tenders, to an extent that more likely than not would preclude a reasonable juror from finding Layer guilty beyond a reasonable doubt on the charges that he faced at the time of his plea.

The April 13, 2010, bar association complaint further tends to reinforce the point that petitioner was capable of articulating and presenting a request for relief prior to the expiration of federal, as well as state, limitation periods.  See also #15, at electronic docketing page 127 (April 6, 2009, letter from defense counsel informing petitioner of ability to file a post-conviction petition).

or any kind of penetration;" (e) the sexual assault examiner's statement in the report that the normal findings were not inconsistent with sexual abuse constituted "inappropriate and unprofessional" editorializing; (f) "you cannot make a complete examination when the examination in and of itself would destroy the hymen;" and (g) "the hymen being still intact denies the fact of the charges brought by the State against petitioner."[21]

As the premise for this argument, petitioner is relying upon a variance between C.P.'s initial recorded statement to the police and her testimony at the preliminary hearing. C.P. exhibited difficulty speaking about sexual issues in her statement. While she indicated in the recorded statement that Layer inserted his penis into her vagina multiple times from the time that she was six until she was ten, she testified at the preliminary hearing that he did so only once while she was ten. At one point in her statement, C.P. states: "I mean, I don't know if he had like sex with us but like if felt like it but I don't –," leaving open the possibility that she was not fully clear at that time as to how Layer penetrated her on all of the occasions.[22]

Inconsistencies between a witness' statement and her later testimony do not preclude a conviction, and jurors are not required to accept an initial statement over later testimony. If jurors found C.P.'s later testimony on this particular point to be the more reliable account of what petitioner did, then the manner, degree and duration of penetration testified to by C.P. – as well as by M.P. – was not necessarily incompatible with a normal examination result. Petitioner pejoratively dismisses the sexual assault examiner's opinion that the normal examination finding was not inconsistent with prior sexual abuse as unprofessional and improper editorializing.[23] However, the examiner's opinion as to the significance of the examination result is competent evidence in a sexual assault case. Lay self-serving

---

[21] See #15, at electronic docketing pages 5-8.

[22] See #15-1, at 65-72 & 75-79. The Court has assumed, *arguendo*, that the copy of the statement transcripts tendered by petitioner are true copies (with the exception of the underlining and writing thereon).

[23] According to petitioner's materials, the examiner checked a box under "Interpretation of Anal-Genital Findings" for "Normal exam: can neither confirm not negate sexual abuse" and a box under "Anal-Genital Findings Are:" for "Consistent with history." The examiner then wrote under "Comments:" "Normal exam does not exclude the possibility of prior sexual molestation or abuse." #15, at 138-46; #15-1, at 1-5.

suppositions – including lay suppositions as to whether the examinations were incomplete and why – are not.

Nor do self-serving lay suppositions constitute new and reliable evidence demonstrating that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt had he instead gone to trial. A normal examination result would not preclude a conviction on a sexual offense involving penetration, as charged in counts that were dismissed as part of the plea bargain. In pragmatically assessing a record with the above-noted findings and comments and with no contrary medical evidence presented, the Court notes that convictions for such sexual offenses are not infrequently obtained and upheld on review in the absence of objective findings reflecting penetration.[24] A normal examination further most certainly would not preclude a conviction on the two counts of attempted lewdness with a child under fourteen to which petitioner pled under *Alford*, as neither offense required proof of penetration as an element of the offense. The offenses to which he entered an *Alford* plea instead involved petitioner's attempted improper fondling of the children with his hands and/or fingers.

Petitioner's further reliance upon various alleged inconsistencies or false statements in the victim's accounts in their initial statements fails to demonstrate actual innocence via the *Schlup* gateway.

For example, petitioner asserts:

> . . . . Page 22 [of C.P.'s statement]. She says he was taking her sister to the other grandparents house "in the truck" and was messing with her and M.P. was hitting him, [but] the petitioner didn't own or have a truck during this time.

#15, at electronic docketing page 6.

C.P. did refer to her sister telling her about the incident occurring while M.P. and Layer were "in the truck." See #15, at electronic docketing page 82. However, in her own statement

---

[24]*Cf. Bacon v. Palmer*, No. 3:09-cv-00245-LRH-WGC, at 5-6 (D. Nev. Feb. 24, 2014)(expert medical testimony in that case referred to a study of pregnant teenage girls where 95 percent otherwise exhibited no objective findings reflecting penetration).

-14-

to the police regarding the incident, in which she herself was involved, M.P. instead referred to the incident occurring "in the car," as she also later testified at the preliminary hearing. See *id.*, at electronic docketing pages 86 and 104. Perhaps a nervous C.P. simply misspoke when she referred to the vehicle as a truck. Perhaps the unspecified vehicle had features that would prompt one young girl to refer to it as a truck and another as a car. However, even if the vehicle undeniably could not conceivably be referred to as a truck by a young girl, and even if petitioner's assertion that he "didn't own or have a truck during this time," as to the unspecified date of the offense, is *arguendo* accepted at face value, such a minor inconsistency in a prior statement simply is not the stuff of which a showing of actual innocence under *Schlup* is made. Such an inconsistency does not demonstrate that it is more likely than not that no reasonable juror would have found petitioner guilty of the particular involved count, of the twenty-six remaining charged counts, and/or of the two counts with lesser charges to which he entered an *Alford* plea.

Petitioner has not presented evidence following the show-cause order that would demonstrate a viable basis for overcoming the untimeliness of the petition based upon alleged actual innocence or that would warrant further record development prior to dismissal.

IT THEREFORE IS ORDERED that the petition shall be DISMISSED with prejudice as untimely.

IT FURTHER IS ORDERED that a certificate of appealability is DENIED. Jurists of reason would not find the district court's dismissal of the petition as untimely to be debatable or wrong. Petitioner's filing exclusively relied on alleged actual innocence as a basis for overcoming the untimeliness of the petition. Petitioner did not satisfy the narrow *Schlup* actual innocence gateway as to the two counts of attempted lewdness with a child under fourteen to which he entered an *Alford* plea. Nor did he satisfy *Schlup* as to the greater charges against him within a 27-count information that were dismissed as part of the plea bargain. First, petitioner presented purported medical evidence that he maintained established that he was actually innocent because he allegedly was impotent. The document that he tendered in support of this argument did not actually demonstrate a medical inability

to commit the offenses at the relevant times, either as to the twenty-four counts not involving penile penetration or as to the three counts involving such penetration. See text, *supra*, at 4-11. Second, petitioner maintained that normal findings in the sexual assault examinations precluded a conviction based on the initial statement given by one of the two children. The normal examination finding was not necessarily inconsistent with the witness' preliminary hearing testimony, however; and any inconsistency between the one child's statement and her later testimony otherwise did not preclude a conviction. See text, *supra*, at 12-14. Petitioner's remaining efforts to parse through other alleged inconsistencies in the witness' statements clearly failed to satisfy *Schlup*. See text, *supra*, at 14-15.

The Clerk of Court shall enter final judgment accordingly, in favor of respondents and against petitioner, dismissing this action with prejudice.

DATED: July 15, 2014

_____
ROBERT C. JONES
United States District Judge